## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMMA AFRIYIE and ROY CAMPBELL, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>NBCUNIVERSAL MEDIA, LLC and PEACOCK TV, LLC<br><br>          Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Amma Afriyie and Roy Campbell (together, "Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendants NBCUniversal Media, LLC ("NBCUniversal") and Peacock TV, LLC ("Peacock TV") (together with NBCUniversal, "NBC" or "Defendants") based on personal knowledge, where applicable, information and belief, and the investigation of counsel.

## <u>INTRODUCTION</u>

1.     Defendant NBCUniversal is one of the largest media conglomerates and video content providers in the United States. NBCUniversal owns and operates several media networks, including NBC News, NBC Sports, MSNBC, and CNBC. NBCUniversal also owns Defendant Peacock TV, LLC, a subsidiary and ad-supported streaming service.

2.     NBC owns and operates a number of video streaming apps including the Peacock TV App, the CNBC News App, the NBC News App, and the NBC Sports App (collectively, "NBC Apps").[1] NBC Apps offer subscribers access to a wide array of prerecorded video content

---

[1] Upon information and belief, other apps offered by NBCUniversal and/or Peacock TV unlawfully disclose users' personally identifiable information and video viewing history to third parties. Plaintiffs reserve the right to amend the

including TV shows, movies, trailers, and clips concerning news, politics, financial and market segments, and sports. Millions of individuals subscribe to NBC Apps to view prerecorded video content each year, including Plaintiffs.

3.     The NBC Apps incorporate third party software development kits ("SDKs"). SDKs allow app and website developers to integrate pre-built functionality into their software products (i.e., preventing them from having to build that functionality from scratch). In particular, the NBC Apps integrate SDKs for the purpose of collecting analytics data (known as "app events") about how consumers use their software. In addition to providing this functionality, these SDKs surreptitiously collect and transmit data to third parties.

4.     Most analytics SDKs track a certain number of user behaviors—such as opening or closing an app—by default. These default activities are called "standard events" and are recorded regardless of a developer's input. Beyond standard events, developers have the ability to define "custom events" for tracking additional user behavior within their apps. These custom events can contain almost any data the developer wants so long as they meet basic formatting requirements, e.g., not containing more than a certain number of characters.

5.     The NBC Apps surreptitiously collected and transmitted data from NBC App subscribers, including Plaintiffs, to third parties, through SDKs using custom app events and/or other means. This data included subscribers' video viewing history (including Video Titles and Video IDs[2] that identify specific videos watched) and personally identifiable information ("PII"). Specifically, the PII that Defendants collected and disclosed included subscribers':

    a.     Adobe ID;[3]

_____

definition of NBC Apps at a later date based on subsequent information discovered.
[2] Video IDs are identifiers that allow someone to uniquely identify a specific video, i.e., a numeric identifier, a full URL, or other identifier.
[3] The Adobe ID is an identifier created by Adobe and is also referred to as the Experience Cloud ID or Marketing

b.    Apple's identifier for advertisers ("IDFA");[4]

c.    Apple's identifier for vendors ("IDFV");[5]

d.    Android's[6] advertising identifier ("AAID");

e.    New Relic ID;

f.    GPS location; and/or

g.    Email address.

6.    By disclosing subscribers' video viewing history with PII, Defendants provided third parties with information sufficient to identify the specific individuals who watched the videos. For example, the Peacock TV App discloses a subscriber's Adobe ID and user or account identifiers, along with their AAID (for Android devices) and IDFA (for iOS devices) to third-party Adobe, together with Video IDs and Video Titles.

7.    Certain third parties that receive subscribers' video viewing history and PII, such as Adobe and mParticle, maintain individual profiles on users. By using these individual profiles, the third parties can match the information transmitted by the NBC Apps and websites to a specific individual using the PII to identify specific users.

8.    Upon information and belief, NBC knows that Adobe and mParticle maintain profiles of individuals, and that these individuals can be identified using the information disclosed, revealing their video watching history in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* (the "VPPA") and the New York Video Consumer Privacy Act, N.Y. GBL § 670, *et seq.* (the "NY VCPA"). NBC knows this because: (a) this information is publicly available on

---

Cloud ID, https://experienceleague.adobe.com/docs/analytics-platform/using/compare-aa-cja/cja-aa-comparison/aaid-ecid-adc.html (last accessed Oct. 26, 2023).
[4] IDFA is a device identifier assigned by Apple to a user's iOS device. iOS is an operating system developed by Apple and is the operating system used on the Apple iPhone.
[5] IDFV is an identifier assigned by Apple to all apps on a single user's iOS device from the same vendor.
[6] Android is a mobile operating system developed by Google.

Adobe and mParticle's websites, and (b) NBC contracts with these third parties for app functionality and analytics services, including SDKs, which NBC profits from through advertising and information services.

9.    The VPPA and the NY VCPA prohibit "video tape service providers," such as NBC, from knowingly disclosing consumers' PII, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without the person having expressly given consent in a standalone consent form.

10.    NBC did not request or obtain consent to disclose Plaintiffs' and Class members' video viewing history and PII in compliance with the VPPA or the NY VCPA.

11.    Accordingly, NBC's conduct violates the VPPA, the NY VCPA and N.Y. Gen. Bus. Law § 349.

## PARTIES

### A.    Plaintiffs

12.    Plaintiff Amma Afriyie ("Afriyie") is a citizen and resident of Hamilton, Ohio.

13.    Plaintiff Afriyie subscribed to NBC's Peacock TV App ("Peacock App") in 2021. Defendants collected Plaintiff Afriyie's name, email address, payment information, and date of birth, in connection with her use of the Peacock App. She downloaded the Peacock App on her iOS mobile device and pays for a Peacock Annual Premium subscription.

14.    Additionally, Plaintiff Afriyie subscribed to NBC's CNBC App in 2021. NBC collected Plaintiff Afriyie's name and email address, in connection with her use of the CNBC App.

15.    Plaintiff Afriyie used the Peacock and CNBC Apps she subscribed to on her iOS mobile device between 2021 and the present to access and view prerecorded video content.

16.     Unbeknownst to Plaintiff Afriyie, Defendants disclosed her video-viewing history, including the title and/or Video IDs of prerecorded videos she viewed, and Plaintiff Afriyie's PII, to third parties through the SDKs it chose to incorporate in these mobile applications and/or other means. NBC did not obtain consent to disclose this information.

17.     Plaintiff Roy Campbell ("Campbell") is a citizen and resident of Glens Falls, New York.

18.     Plaintiff Campbell subscribed to the Peacock App in 2022. Defendants collected Plaintiff Campbell's name, and email address in connection with his use of the Peacock App. Plaintiff Campbell downloaded the Peacock App on his iPhone (an iOS device), and pays for a monthly subscription to the Peacock App. Plaintiff Campbell viewed video content exclusive to Peacock App subscribers on the Peacock App on his iPhone.

19.     Unbeknownst to Plaintiff Campbell, Defendants disclosed his video-viewing history, including the title and/or Video IDs of prerecorded videos he viewed, and Plaintiff Campbell's PII, to third parties through the SDKs it chose to incorporate in these mobile applications and/or other means. NBC did not obtain consent to disclose this information.

**B.     Defendants**

20.     Defendant NBCUniversal Media LLC is a Delaware corporation, a subsidiary of Comcast Corporation, headquartered at 30 Rockefeller Plaza, New York, NY 10112.

21.     Defendant Peacock TV, LLC is a Delaware Corporation, a subsidiary of NBCUniversal Media, LLC, headquartered at 30 Rockefeller Plaza, New York, NY 10112.

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*. This Court also has

subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

23.    This Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs and Class members' N.Y. Gen. Bus. Law § 349 and N.Y. GBL § 670 claims because these claims arise from a common nucleus of operative facts relating to NBC's incorporation of SDKs in NBC Apps and subsequent disclosure of subscribers' PII and video viewing history through SDKs and/or other means.

24.    This Court has general personal jurisdiction over Defendants because they maintain their principal place of business in New York. Defendants are also subject to specific personal jurisdiction in this State because they maintain sufficient minimum contacts with the State of New York and a substantial part of the events and conduct giving rise to Plaintiffs' and Class members' claims occurred in this state.

25.    Further, NBCUniversal Media LLC and Peacock TV, LLC's terms and conditions each include a forum selection clause requiring actions to be brought exclusively in the federal or state courts located in New York, New York.[7]

26.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

---

[7] *NBCUniversal Privacy Policy*, NBCUniversal (Dec. 16, 2022), https://www.peacocktv.com/terms.

## FACTUAL ALLEGATIONS

**A.     The NBC Apps**

**i.     The Peacock App**

27.     Peacock is a video streaming app that offers over 10,000 hours of prerecorded TV shows, movies, and more.

28.     Just one year after its launch in 2020, Peacock generated $778 million[8] in revenue. Presently, Peacock has over 22 million subscribers.

29.     To subscribe to Peacock using the app, users must download the app from either from the App Store (on iOS devices) or the Google Play (on Android devices). Users must then provide, at a minimum, their name, date of birth, and email address. To subscribe, users are also required to pay either $5.99 a month for Peacock's ad-supported video viewing content or $11.99 per month[9] for ad-free video viewing content.[10]  Peacock subscribers provide their email address, their IP address, and advertising[11] and app IDs, including, but not limited to, their IDFA (for iOS devices), AAID (for Android devices), and Adobe ID.

30.     By subscribing to Peacock, Plaintiffs and members of the Class were provided access to video content exclusive to subscribers.

**ii.     The CNBC App**

31.     The CNBC App is a news app that allows subscribers to view pre-recorded video content such as business news, tech news, financial news, and culture.

---

[8] Todd Spangler, *Peacock Loss Grows to $1.7 Billion in 2021 as Comcast Q4 Tops Expectations*, Variety (Jan. 27, 2022, 4:40 AM), https://variety.com/2022/biz/news/peacock-loss-2021-more-doubled-1235164939/.
[9] The Peacock App also formerly offered a free version that provided limited access to videos.
[10] Derek Blaine, *Peacock Busts Through 22 Million Subscriber Mark: Peak Losses In 2023 At $3 Billion*, Forbes (Apr. 30, 2023, 7:53 PM), https://www.forbes.com/sites/derekbaine/2023/04/30/peacock-busts-through-22-million-subscriber-mark--peak-losses-in-2023-at-3-billion/?sh=4ff780ebf980.
[11] Advertising IDs are provided unless the user has opted out of providing Advertising IDs on their device. Other identifiers, such as the Adobe ID, are generated and collected for the purpose of identifying users in the event that users have opted out of providing their advertising ID.

32.     The CNBC App has millions of subscribers, evidenced by the fact that the CNBC App has been downloaded from the Google Play Store over 5 million times.

33.     To subscribe to the CNBC App, users must download the app from either from the App Store (on iOS devices) or Google Play (on Android devices). To subscribe to CNBC's premium video-viewing service, Pro TV, users are required to provide their email address and pay NBC either $199.99 annually or $34.99 monthly.  CNBC App subscribers must provide, at a minimum, their email address, their IP address, and advertising and app IDs, specifically including their AAID, Android ID, New Relic ID and Adobe ID (for Android devices) and IDFA, IDFV, and New Relic ID (for iOS devices).

34.     NBC requires users to pay a premium for CNBC's video-viewing service, starting at $34.99 per month or $199.99 per year.

35.     By subscribing to the CNBC App, Plaintiff Afriyie and members of the Class were provided access to video content exclusive to subscribers.

        **iii.    The NBC News App**

36.     The NBC News App is a news app that allows subscribers to view pre-recorded video content such as U.S. News, world news, business news, and health and culture news.

37.     The NBC News App has millions of subscribers, evidenced by the fact that the NBC News App has been downloaded from the Google Play Store over 5 million times.

38.     To subscribe to the NBC News App, users must download the app either from the App Store (on iOS devices) or Google Play (on Android devices) and provide NBCUniversal with their IP Address, and advertising and app IDs, specifically including their Adobe ID, AAID, user's device name and GPS Location (for Android devices), and IDFA, IDFV, and user's device name[12]

---

[12] iOS devices' default name is the user's first and last name.

(for iOS devices).

39.     By subscribing to the NBC News App, members of the Class were provided access to video content exclusive to subscribers.

### iv.     The NBC Sports App

40.     The NBC Sports App is a sports news app that allows subscribers to view pre-recorded video content, including highlights from sporting events and episodes of NBC TV shows.

41.     The NBC Sports App has millions of subscribers, evidenced by the fact that the App has been downloaded from the Google Play Store over 10 million times.

42.     To subscribe to the NBC Sports App, users must download the app either from the App Store (on iOS devices) or Google Play (on Android devices) and provide their email address. To access additional content, users must additionally create an NBCUniversal profile and provide their email address, IP Address, advertising, and app IDs, specifically including their AAID, Android ID, and Adobe ID. Users can also access additional content by linking their cable provider, which requires providing additional information (i.e., their cable provider user ID and password).

43.     By subscribing to the NBC Sports App, members of the Class were provided access to video content exclusive to subscribers.

### B.     NBC Tracks and Discloses Video Viewing History and PII to Third Parties

### i.     NBC Collects and Transmits Subscriber's Data Using SDKs and/or Other Means

44.     Defendants surreptitiously collected and transmitted subscribers' video viewing history and PII to third parties through SDKs that Defendants incorporated into the NBC Apps, and/or other means.

45.     An SDK is a set of software components, provided by third parties, that app developers, such as Defendants, can use to add functionality or features to their apps. For example, SDKs can provide app analytics and advertising services.

46.     Unbeknownst to Plaintiffs and the class, Defendants incorporated several SDKs into the NBC Apps[13] and received analytical insights about subscribers, including subscribers' video viewing history. This analytical information allowed Defendants to improve their services, tailor their product offerings to subscribers, and market and sell other products.

47.     Defendants intentionally incorporated third party SDKs into the NBC Apps to take advantage of these analytical insights. Because NBC operates and controls NBC Apps, only NBC could have made the decision to incorporate SDKs into NBC Apps.

48.     While the use of SDKs is free to app developers, such as Defendants, there is a cost. By incorporating SDKs into the NBC Apps, Defendants surreptitiously collect and transmit subscribers' data to third parties. These third parties economically benefit from amassing data about individuals.

ii.     **NBC Discloses App Subscribers' Video History and PII to Third Party Adobe**

49.     Unbeknownst to Plaintiffs and the class, Defendants surreptitiously collected and transmitted subscribers' video viewing history and PII to third party Adobe, through the Adobe Experience SDK and/or other means.

50.     Specifically, each of the NBC Apps surreptitiously transmit subscribers' video history (in the form of Video Titles and/or Video IDs), as well as PII in the form of, at least the subscriber's IDFA (for iOS devices) or AAID (for Android devices) and Adobe ID, to third party

---

[13] Defendants incorporated the Adobe Experience SDK and/or mParticle SDK, along with other SDKs, into the NBC Apps.

Adobe.

51.    The PII disclosed to Adobe is sufficient for Adobe to link the subscriber's video history to individual subscribers. Thus, Adobe can identify individual subscribers in connection with the video content particular subscribers viewed.

52.    Adobe is able to identify subscribers through its Experience Cloud Platform which contains profiles about individual consumers, without subscribers' knowledge.

53.    Adobe's Experience Cloud Platform "provides businesses and brands with an open and extensible system for customer experience management that transforms customer data into robust customer profiles that update in real time and uses insights driven by artificial intelligence ("AI") to enable the delivery of personalized digital experiences across various channels in milliseconds."[14]

54.    The Adobe Experience Cloud Platform maintains unique customer profiles for individuals.  The Adobe website touts:

> Real-Time CDP [customer data platform] makes data across the organization available and actionable to marketers. Securely collect, manage, resolve, and organize customer data from any source — including personally identifiable information — into unified profiles with real-time insights that can be used for personalization and segmentation, and activated across channels, at scale.[15]

55.    "The [customer] profile starts by integrating data from all customer touchpoints, combining personally identifiable data from sources such as CRM and loyalty programs, with unknown user data — like web searches, ad clicks, and device IDs."[16]

---

[14] Adobe, Inc., Annual Report (Form 10-K) (Jan. 17, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/796343/000079634323000007/adbe-20221202.htm
[15] *With customer data unification, know who your customers are and what they're looking for*, Adobe Experience Cloud, https://business.adobe.com/products/real-time-customer-data-platform/unified-profile-data.html (last visited Aug. 1, 2023).
[16] *Id.*

56.    The customer profiles link together multiple records to create "unified person profiles" featuring "linked identities, along with all your customer's real-time consumer, professional, or combined attributes or behavioral data across channels and all lines of business." *Id.*

57.    The information gathered to create the customer profile in the Adobe Experience Platform is shown below:[17]



58.    Adobe uses data obtained through Analytics, such as a subscriber's IDFA (for iOS devices) or AAID (for Android devices) and Adobe ID, obtained through SDKs included in the NBC Apps and/or other means, to link subscribers' video viewing history to specific customer

---

[17] Adobe Experience Cloud, https://business.adobe.com/products/experience-platform/adobe-experience-platform.html (last visited Aug. 1, 2023).

profiles.

59.     Adobe's Experience Cloud identity service "creates identity graphs that represent a database that holds customer profiles and the known identifiers that belong to individual consumers."[18] Adobe admits that it uses identifiers to identify specific individual consumers.

60.     Through Adobe's Experience Platform, NBC can connect to some of the largest Digital Advertising networks, such as Google Ads, Amazon Ads Connection, Microsoft Bing Connection, and Criteo Corporation. Adobe also benefits from NBC's unauthorized disclosures because the data disclosed enhances Adobe's analytics and marketing products.

61.     Adobe is able to identify subscribers with several identifiers. For example, Adobe assigns an Adobe ID, also known as Adobe Experience Cloud ID ("ECID"), to app users.  These Adobe identifiers are unique, persistent identifiers that Adobe assigns to app users and/or website visitors and allows Adobe to track users across devices. Adobe touts that the ECID "provides the foundation for customer identity" and "is used as the primary ID for devices and a base node for identity graphs."[19]

62.     The ECID allows Adobe to identify app users even if they have turned off collection of advertising identifiers on their mobile devices, which is offered by both Android and iOS devices.

63.     In fact, starting with iOS version 14.5 in 2021, Apple made ad tracking opt-*in*, meaning users must affirmatively enable such tracking, which allows advertisers to track the user's IDFA.  Five months after iOS version 14.5 was released, only 21% of people had opted in to ad tracking.[20]

---

[18]  Adobe Experience Cloud, https://business.adobe.com/products/experience-platform/identity-service.html  (last visited Aug. 1, 2023).
[19] *Id.*
[20]  Thorin Klosowski, *Looking Back on a Year of Apple's Privacy Labels and Tracking* (Mar. 31, 2023),

64.    The advent of opt-in tracking by Apple has led to efforts by third parties to circumvent privacy controls by tracking using third party identifiers such as the ECID.

65.    Plaintiffs and the class assert, upon information and belief, that, unbeknownst to subscribers, Adobe assigns an ECID persistent identifier to subscribers when Defendants surreptitiously transmit subscribers' video viewing history and PII.

66.    Adobe confirms that it can identify subscribers by "connecting" persistent identifiers and PII to identify NBC App subscribers. The following graphic summarizes Adobe's ability to "connect[] IDs across all data sets" to connect back to an individual:[21]



67.    Using the PII provided to Adobe, Adobe was able to identify Plaintiffs and Class members and attribute their video viewing history to an individualized profile in its databases.

---

https://www.nytimes.com/wirecutter/blog/apple-privacy-labels-tracking/.
[21] Adobe Experience League, "Identity and identity graphs overview," https://experienceleague.adobe.com/docs/platform-learn/tutorials/identities/understanding-identity-and-identity-graphs.html?lang=en (last visited Aug. 1, 2023).

      iii.    **NBC App Subscribers' Video History and PII is Disclosed to Third Party mParticle**

68.    Unbeknownst to Plaintiffs and the class, Defendants surreptitiously collected and transmitted subscribers' video viewing history and PII to third party mParticle, through an mParticle SDK and/or other means.

69.    Specifically, the NBC Sports App surreptitiously provides mParticle with a subscriber's video history (in the form of Video Titles and Video IDs), as well as PII in the form of, at least, the subscriber's AAID, Adobe ID, user or account identifiers, and email (for Android devices).

70.    The NBC News App provides mParticle with a subscriber's video history (in the form of Video Titles and Video IDs), as well as PII in the form of, at least, the subscriber's Adobe ID and AAID (for Android devices) and IDFV and the user's device name, which may include the user's first and last name (ex. "Jane Smith's iPhone") (for iOS devices).

71.    The CNBC News App provides mParticle with a subscriber's video history (in the form of Video Titles and Video IDs), as well as PII in the form of, at least, the subscriber's New Relic ID and Android ID (for Android devices).

72.    The PII disclosed to mParticle is sufficient for mParticle to link the subscriber's video history to individual subscribers. Thus, mParticle can identify subscribers with their corresponding video viewing history.

73.    mParticle is able to identify subscribers because mParticle maintains profiles of individual consumers on its platform, IDSync. [22]

---

[22] *IDSync Overview*, mParticle Docs, https://docs.mparticle.com/guides/idsync/introduction/; *Use Cases for IDSync*, mParticle Docs, https://docs.mparticle.com/guides/idsync/use-cases/#user-(last visited Aug. 1, 2023).

74.    mParticle's IDSync "allows marketers to accurately identify customers in key moments of their journey in order to support robust targeting and personalization, and to deliver consistent user experiences across all devices, touchpoints, and channels[.]"[23] mParticle's user profiles compile "the most up-to-date real-time user identities, device identities, user attributes, and audience memberships."[24] These user profiles "decisively link data generated from your apps with data from other sources, like CRM Feeds."[25] Further, these user profiles can be queried to find a specific individual user using identifiers such as an email address, phone number, or device ID.[26]

75.    Web and app developers configure the data disclosed to mParticle,[27] including both user data and event data.[28] Event data shows what actions end users took within an app, "such as clicking a button or watching a video,"[29] while user data includes "data about your user, including their identities[.]"[30] mParticle explains "[u]ser identities are unique identifiers for your user, like an email address or customer ID . . . . User identities help mParticle keep track of unique users of your app and allow you to track a user's activity over time and across different devices[.]" mParticle further explains "user identity is a way of identifying a person, independently of the device they are currently using."[31]

---

[23] *IDSync Overview*, mParticle Docs, https://docs.mparticle.com/guides/idsync/introduction/ (last visited Aug. 1, 2023).

[24] *Id.*

[25] *Use Cases for IDSync*, mParticle Docs, https://docs.mparticle.com/guides/idsync/use-cases/ (last visited Aug. 1, 2023).

[26] *IDSync Overview*, mParticle Docs, https://docs.mparticle.com/guides/idsync/introduction/ (last visited Aug. 1, 2023).

[27] *Create an Input*, mParticle Docs, https://docs.mparticle.com/guides/getting-started/create-an-input/ (last visited Aug. 1, 2023).

[28] *Start capturing data*, mParticle Docs, https://docs.mparticle.com/guides/getting-started/start-capturing-data (last visited Aug. 1, 2023).

[29] *Id.*

[30] *See* note 23.

[31] *Id.*

76.     mParticle explains that "[e]very piece of data collected is attributed to a user" and "identity resolution is the process of determining which user profile incoming data should be added to."[32]

77.     To identify users, mParticle has three steps: 1) "[a]n identification request is made via one of the mParticle platform SDKs or the HTTP API"; 2) "mParticle looks for a matching user profile" by "comparing the identifiers included in the request with each identifier" in NBC preconfigured to be used in matching user profiles;[33] and 3) mParticle returns a matching user profile, or creates a new one and assigns an mParticle ID based on the user's device ID, if none was found to exist.[34]

78.     Through use of the mParticle SDK in the NBC Apps and/or other means of transmission, Defendants provided third party mParticle with subscribers' video viewing history and PII. Using the PII Defendants provided to mParticle, mParticle was able to identify Plaintiffs and Class members and attribute their video viewing history to an individualized profile in its databases.

### C.     NBC App Subscribers Did Not Consent to Disclosure

79.     Plaintiffs and Class members did not consent to NBC's disclosure of their video viewing history and PII.

80.     The VPPA requires Defendants to obtain informed, written consent from subscribers before disclosing their video viewing history and PII with third parties.

---

[32] *Identify Users*, mParticle Docs, https://docs.mparticle.com/guides/idsync/identify-users/ (last visited Aug. 1, 2023).
[33] *Components of IDSync – Identity strategies*, mParticle Docs, https://docs.mparticle.com/guides/idsync/components/#identity-priorities (last visited Aug. 1, 2023).
[34] *Identify Users – Identity resolution*, mParticle Docs, https://docs.mparticle.com/guides/idsync/identify-users/#identity-resolution (last visited Aug. 1, 2023).

81.     As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. The NBC Apps do not provide any separate written consent form at the time of sign up,[35] or otherwise in a form that meets these requirements.

82.     Defendants did not comply with the VPPA by failing to obtain the informed, written consent of Plaintiffs and the Class to share their video viewing history and PII with third parties.

83.     Therefore, Defendants failed to obtain informed, written consent in compliance with VPPA.

84.     Defendants also failed to obtain informed, written consent in compliance with the NY VCPA.  See ¶ 137, *infra.*

**D.     Plaintiffs and Class Members Were Harmed by NBC's Privacy Violations**

85.     Defendants' conduct violates Plaintiffs' and Class members' privacy rights and deprived them of control over their personal information.

86.     Defendants' conduct inflicted exactly the type of harm on Plaintiffs and Class Members that the VPPA and the NY VCPA were designed to prevent.

87.     The VPPA was passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where

---

[35] The NBC Sports App currently does contain a disclosure concerning sharing of video viewing history.  Upon information and belief, this disclosure was not present during the entirety of the Class Period and does not comply with the disclosure requirements of the NY VCPA.

that information goes." S. Rep. No. 100-599 at 6-7 (1988). Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7 (1988) (statements of Sens. Simon and Leahy, respectively).

88.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

89.     These statements resonate even more now than they did in 1988 when the VPPA was passed, as data mining from online activities is more common and sophisticated than ever before. During a Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."

90.     Similarly, in 1993, the New York State Senate became concerned about personal privacy.  Specifically, the legislature acknowledged the widespread popularity of viewing rented video tapes and movies in the home through various retailers. In doing so, "innumerable retail establishments in this state commonly record, often by computer, data containing the identifies of consumers who have rented video tapes and movies and the titles of the videos rented."[36] The legislature was concerned about the risk of public dissemination of personally identifiable information. The legislature believed that this is a matter of state concern due to the large amounts of personal identifiable information being collected and poses a serious threat to New Yorkers.[37]

91.     In passing the NY VCPA. the legislature's intent was to "protect the personal privacy of individuals and their families who rent video cassette tapes and movies and similar audio-visual materials, without unreasonably restricting the ability of video tape service providers to collect and use information as is necessary to conducting their business.[38]

92.     In this case, Defendants violated Plaintiffs' and Class members' privacy rights by purposely disclosing their video viewing activity and PII to third parties. Plaintiffs and Class members reasonably expected their viewing histories, preferences, PII, and identities would be kept private.

93.     The personal information Defendants obtained from Plaintiffs and Class members is valuable data in the digital advertising-related market for consumer information.

94.     Because NBC places advertisements alongside its pre-recorded video content and embeds commercials within its video content, NBC is incentivized to enhance the "targeting" of such ads, allowing companies who pay NBC to advertise reach their "ideal" audience.

---

[36] N.Y. Gen. Bus. Law § 671.
[37] *Id.*
[38] *Id*.

95.     NBC benefits at Plaintiffs' and Class members' expense, where Plaintiffs and Class members never consented to NBC's disclosure of their PII.

96.     The harms described above are aggravated by NBC's continued retention and commercial use of Plaintiffs' and Class members' personal information, including their private video viewing histories.

## CLASS ALLEGATIONS

97.     Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following class:

> All persons in the United States who subscribed to an NBC App and viewed prerecorded video content on an NBC App on an Android or iOS device during the period September 1, 2013 to the present ("Class Period") (the "Class").

98.     Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

99.     Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which NBC or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendants' counsel.

100.    **Numerosity:** The Class consists of at least hundreds of thousands of individuals, making joinder impractical.

101.    **Commonality and Predominance:** Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include, but are not limited to:

a.   Whether Defendants' use and disclosure of Plaintiffs' and Class members' PII and video viewing history was without user consent or authorization;

b.   Whether Defendants obtained and shared, or caused to be obtained and shared, Plaintiffs' and Class members' PII;

c.   Whether Defendant's disclosures were committed knowingly;

d.   Whether Defendants disclosed Plaintiffs' and Class members' personal information as a result of Defendants' conduct described herein;

e.   Whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.;

f.   Whether Defendants' conduct violates N.Y. Gen. Bus. Law § 349;

g.   Whether Defendants' conduct violates New York Video Consumer Privacy Act, N.Y. GBL § 670, et seq.;

h.   Whether Defendants' acquisition and transmission of Plaintiffs' and Class members' personal information resulted in harm; and

i.   Whether Defendants should be enjoined from engaging in such conduct in the future.

102.   **Typicality:** Plaintiffs' claims are typical of the claims of Class members in that Plaintiffs, like all Class members, have been injured by NBC's misconduct—disclosing subscribers' PII and viewing content to Third parties without consent.

103.   **Adequacy of Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

22

104.    **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce NBC to comply with federal and state law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of NBC's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

105.    **Injunctive relief:** Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

106.    The applicable statutes of limitation have been tolled as a result of Defendants' knowing and active concealment and denial of the facts alleged herein.

107.    Defendants secretly incorporated the third parties' SDKs into NBC Apps, providing no indication to users that they were interacting with apps that shared their data, including PII and video viewing histories, in such a way that the video viewing history could be associated with their individual identity.

108.    Plaintiffs and Class members could not have discovered the full scope of Defendant's conduct at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendant, including, but not limited to: (1) there were no disclosures or other indication that would inform a reasonable consumer that NBC was disclosing, and third parties were receiving and/or intercepting, PII and video viewing

history from NBC Apps; (2) the manner in which NBC shares users' PII and video viewing history from NBC Apps to third parties is highly technical; and (3) deciphering the coding language that transmits users' PII and video viewing history from NBC Apps to third parties requires advanced expertise, beyond the scope of a reasonable consumer.

109.    The earliest Plaintiffs and Class members could have known about Defendants' conduct was shortly before the filing of this Complaint.

110.    Defendants were under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendants are therefore estopped from relying on any statute of limitations under the discovery rule.

111.    Plaintiffs and Class members were not aware that Defendants disclosed and intercepted their data, including PII and video viewing history.

112.    Plaintiffs and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendants' misconduct by virtue of their fraudulent concealment.

113.    Accordingly, all statutes of limitation are tolled under the doctrine of fraudulent concealment.

## NEW YORK LAW APPLIES TO THE CLASS

114.     New York's substantive laws apply to every member of the Class, regardless of where in the United States the Class Member resides.

115.    NBCUniversal's Terms of Service state: "These TOS [Terms of Service], any Supplemental Terms, and the relationship between you and us shall be governed by the laws of the U.S. and the State of New York without regard to its conflicts of law provisions."

24

116. Peacock's Terms of Service state: "These Terms, any Additional Terms and the relationship between you and us shall be governed by the laws of the U.S. and the State of New York without regard to its conflicts of law rules."

117. By choosing New York law for the resolution of disputes in the agreements, Defendants conceded that it is appropriate for this Court to apply New York law to the instant dispute.

118. Further, New York's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV § 1 of the U.S. Constitution. New York has significant contacts, or a significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interest that ensures that the choice of New York state law is not arbitrary or unfair.

119. Defendants' headquarters and principal places of business are located in New York. Defendants also own property and conduct substantial business in New York, and therefore New York has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New York and avail itself of New York's laws, and to engage in the challenged conduct from and emanating out of New York, renders the application of New York law to the claims herein constitutionally permissible.

120. New York is also the state from which Defendants' alleged misconduct emanated. This conduct similarly injured and affected Plaintiff and all other Class members.

121. The application of New York laws to the Class is also appropriate under New York's choice of law rules because New York has significant contacts to the claims of Plaintiff and the proposed Class, and New York has a greater interest in applying its laws here than any

other interested state.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**(Video Privacy Protection Act)**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiffs and Class)**

122.    Plaintiffs incorporate and reallege the above factual allegations by reference.

123.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

124.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Each Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because they engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiffs viewed on NBC Apps—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

125.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and Class members are subscribers of the NBC Apps, which provide video content to users. Plaintiffs and Class members are subscribers under the VPPA because they downloaded NBC Apps and provided NBC, at a minimum, their email address, IDFA or IDFV (for iOS devices), AAID (for Android devices), the title or ID of the videos they viewed, their Adobe ID, and/or paid a monthly or annual

fee, in order to view exclusive video content on the NBC Apps.

126.    As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

127.    Defendants knowingly caused Plaintiffs' and Class members' video viewing information, as well as IDFA or IDFV (for iOS devices), AAID (for Android devices), Adobe IDs third party identifiers, and other unique identifiers, to be disclosed to third parties, including Adobe and mParticle. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to third parties as an individual who viewed Defendants' content, including the specific prerecorded video materials watched on NBC Apps. This information allowed third parties, such as Adobe, to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

128.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendants failed to obtain informed, written consent under this definition.

129.    Defendants were aware that the disclosures to third parties that it shared through SDKs it incorporated in NBC Apps identified Plaintiffs and Class members. Indeed, both mParticle and Adobe publicly tout their abilities to connect PII to individual user profiles. Defendants also knew that Plaintiffs' and Class members' personal viewing content was disclosed to third parties because Defendants programmed the SDKs into NBC App's code so that third parties would

receive video titles or video IDs and the subscriber's unique identifiers, such as IDFA, IDFV or AAID and third-party identifiers when a subscriber watched a prerecorded video. The purpose of the SDKs was to obtain identifiable analytics and intelligence for Defendants about their user base, while also benefiting the SDK providers by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

130.    By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Defendants violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits and Plaintiffs and the class were damaged. *See* 18 U.S.C. § 2710(c).

131.    As a result of the above violations, Defendants are liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500 per violation." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Defendants are also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendants in the future.

## SECOND CLAIM FOR RELIEF
### NEW YORK VIDEO CONSUMER PROTECTION ACT
### N.Y. Gen. Bus. Law §§ 670-675
### (On Behalf of Plaintiffs and the Class)

132.    Plaintiffs repeat the allegations contained above, as if set forth fully herein.

133.    Plaintiffs are "consumers" because they are "subscriber[s] of goods or services from a video tape service provider." N.Y. Gen. Bus. Law § 672(1). Plaintiffs and Class members are subscribers of the NBC Apps, which provide video content to users. Plaintiff and Class members are subscribers under the NY VCPA because they downloaded NBC Apps and provided Defendants, at a minimum, their email address, IDFA or IDFV (for iOS devices), AAID (for

Android devices), the title or ID of the videos they viewed, their Adobe ID, and/or paid a monthly or annual fee, in order to view exclusive video content on the NBC Apps.

134.    Each Defendant is a "video tape service provider" because they are "engaged in the business of rental of prerecorded video cassette tapes or similar audiovisual materials[,]" N.Y. Gen. Bus. Law § 672(4), including the prerecorded videos that Plaintiff viewed on NBC Apps— that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

135.    "Personally identifiable information" is "information that identifies a person as having requested or obtained specific video materials or services from a video tape service provider." N.Y. Gen. Bus. Law § 672(3).

136.    Defendants knowingly caused Plaintiff's and Class members' video viewing information, as well as IDFA or IDFV (for iOS devices), AAID (for Android devices), Adobe IDs, third party identifiers, and other unique identifiers, to be disclosed to third parties, including Adobe and mParticle. This information constitutes personally identifiable information under N.Y. Gen. Bus. Law § 672(3) because it identified each Plaintiff and Class member to third parties as an individual who obtained specific video materials or services from Defendants through NBC Apps. This information allowed third parties, such as Adobe, to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

137.    As set forth in N.Y. Gen. Bus. Law § 672(6), "informed, written consent" must be (1) "in writing in at least ten point bold face type, affixed to any membership, subscriber or rental agreement between the consumer and the video tape service provider, and shall be posted on a sign in full and clear view of the consumer at the point of rental transaction;" and (2) be drafted to

include the language provided by N.Y. Gen. Bus. Law § 672(6).[39] Defendants failed to obtain informed, written consent under this definition.

138.    Defendants were aware that the disclosures to third parties that it shared through SDKs it incorporated in NBC Apps identified Plaintiff and Class members. Indeed, both mParticle and Adobe publicly tout their abilities to connect PII to individual user profiles. Defendants also knew that Plaintiff's and Class members' personal viewing content was disclosed to third parties because Defendants incorporated SDKs and/or other methods of data transmission into the NBC Apps knowing that third parties would receive video titles or video IDs and the subscriber's unique identifiers, such as IDFA, IDFV or AAID and third-party identifiers when a subscriber watched a prerecorded video. The purpose of these transmissions was to obtain identifiable analytics and intelligence for Defendants about their user base.

139.    In accordance with N.Y. Gen. Bus. Law § 675, the Plaintiffs and members of the proposed Class have been injured for violations of N.Y. Gen. Bus. Law § 673(5) and seek damages of not less than $500 for said violations, regardless of the actual amount of damages proved, plus costs, disbursements, and reasonable attorneys' fees.

140.    By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Defendants violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits and Plaintiffs and the class were damaged. *See* N.Y. Gen. Bus. Law § 675.

---

[39] "This video tape service provider from time to time provides to marketers of goods and services, the names and addresses of customers and a description or subject matter of materials rented by video customers. You have the right to elect not to have your name, address or the description or subject matter of any material rented included in such lists. This election may be changed by you, in writing, at any time.
I do not object to the release of my name, address or the description or subject matter of the material rented.

_____
Signature
I do object to the release of such information.

_____
Signature"

141.    As a result of the above violations, Defendants are liable to Plaintiff and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "not less than five hundred dollars in damages, regardless of the amount of actual damage proved[.]" N.Y. Gen. Bus. Law § 675(1). Under the NY VCPA, Defendants are also liable for reasonable attorney's fees, other litigation costs.

**THIRD CLAIM FOR RELIEF**
**NEW YORK'S UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of Plaintiffs and the Class)**

142.    Plaintiffs repeat the allegations contained above, as if fully set forth herein.

143.    N.Y. Gen. Bus. Law § 349 ("GBL § 349") prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

144.    As consumers of NBC's services, Plaintiff and Class members are "person[s]" within the meaning of GBL § 349.

145.    Plaintiffs are authorized to bring a private action under GBL § 349(h).

146.    Defendants conducted business, trade, or commerce in New York State.

147.    Plaintiffs and Class members viewed videos in connection with transactions in "business," "trade," or "commerce" within the meaning of GBL § 349.

148.    This count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts related to Defendants' failure to disclose its practice of sharing Plaintiffs' and Class members' PII and video viewing histories could be associated with their individual identity, without Plaintiff's or the Class members' knowledge or consent, to third parties.

149.    Defendants systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of Plaintiffs and Class members.

150.    Defendants willfully engaged in such acts and practices and knew or acted in reckless disregard for whether they violated GBL § 349.

151.    Defendants' representations and omissions were material because NBC subscribers, including Plaintiffs and Class members, would not have used NBC's services, or would have paid less for such services, had they known that NBC would disclose Plaintiffs' and Class members' PII and video viewing histories could be associated with their individual identity, without Plaintiff's or the Class members' knowledge or consent, to third parties.

152.    Plaintiffs and Class members relied on Defendants' deceptive representations and omissions when they subscribed for NBC's products and services.

153.    Plaintiffs and Class members had no way of knowing Defendants secretly disclosed Plaintiffs' and Class members' PII and video viewing histories in such a way that the video viewing history could be associated with their individual identity, without Plaintiff's or the Class members' knowledge or consent, to third parties.

154.    Plaintiffs and Class members have been injured as a direct and proximate result of Defendants' violations as they would not have purchased, or would have paid significantly less for, NBC's services, had they known that their PII and video viewing histories would be shared in such a way that the video viewing history could be associated with their individual identity, without Plaintiff's or the Class members' knowledge or consent, to third parties.

155.    The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition. Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50, whichever is greater,

treble damages, injunctive relief, and attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

156.    Plaintiffs repeat the allegations contained above, as if fully set forth herein.

157.    Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

158.    Defendants received benefits from Plaintiffs and Class members in the form of the Plaintiffs' highly valuable data, including PII and video viewing history, that Defendants wrongfully disclosed to third parties without authorization and proper compensation. Defendants' retention of these ill-gotten gains is unjust and inequitable.

159.    Defendants disclosed and used this data for their own gain, providing Defendants with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

160.    Had Plaintiffs known of Defendants' misconduct, they would not have provided any of their data to Defendants or have used or paid to use NBC Apps.

161.    Defendants unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendants' conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

162.    The benefits that Defendants derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in New York and every other state for Defendants to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

163.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A.     Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

B.     Enter judgment in favor of Plaintiffs and the Class;

C.     Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

D.     Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

E.     Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.     Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

G.     Enter such other orders as may be necessary to restore to Plaintiffs and Class members any money and property acquired by Defendants through their wrongful conduct;

H.     Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

I.     Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: October 26, 2023                    Respectfully submitted,

/s/ *Christian Levis*
Christian Levis
Nicole A. Veno
Amanda Fiorilla
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
nveno@lowey.com
afiorilla@lowey.com

Michael Canty
Carol Villegas
Danielle Izzo
**LABATON SUCHAROW LLP**
140 Broadway, 34th Fl.
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
cvillegas@labaton.com
dizzo@labaton.com

*Attorneys for Plaintiffs*